IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

KEITH W.R. LOWE,

        **Plaintiff,**

v.                                        Case No. 2:13-cv-22416

CAPTAIN RUSSELL MATHENEY,
LIEUTENANT BRIAN FERNANDEZ,
SERGEANT JEFFREY HILEWITZ,
OFFICER DOUG ELLIOT,
WARDEN DAVID BALLARD,
COMMISSIONER JAMES RUBENSTEIN,
KATHY DILLON, and MAJOR ROBERT RHODES,
each in his or her individual capacity,

        **Defendants.**

MEMORANDUM OPINION AND ORDER

Pending before the court is a Motion to Dismiss filed by defendants Elliot, Ballard, Rubenstein, Dillon, and Rhodes [Docket 47].  For the reasons stated herein, it is hereby **ORDERED** the motion is **GRANTED in part** and **DENIED in part**.

PLAINTIFF'S ALLEGATIONS

The plaintiff's Third Amended Complaint alleges that, on October 1, 2012, the plaintiff was subjected to an excessive use of force by defendants Matheney, Fernandez, Hilewitz, and Elliot.  As alleged in detail in the Third Amended Complaint, on October 1, 2012, the plaintiff claims that he experienced a "paranoid schizo anxiety attack" and "was convinced that they [COs and 'the administration'] were coming to get him."  [*Id.* at 10-11, ¶ 24].  Despite repeatedly

requesting mental health assistance, none was provided, so the plaintiff covered up his window and refused to communicate with staff.  [*Id.* ¶¶ 26-29].

A cell extraction team was assembled, which was led by Captain Russell Matheney. Defendants Fernandez, Hilewitz, and Elliot were members of that team.  When the plaintiff did not respond to Matheney's commands to come out of his cell, members of the cell extraction team deployed various chemical agents and other weaponry, including sting ball grenades and a beanbag shot from a shotgun, into the plaintiff's cell over a period of approximately 45 minutes.  Matheney then directed the team to enter the plaintiff's cell and extract him.  [*Id.* at 12-13, ¶¶ 32-43].  The plaintiff was subsequently placed into a restraint chair and held for eight hours.  [*Id.* at 13-14, ¶¶ 44-54].  The plaintiff alleges that the amount of force used against him was excessive and, thus, violated his rights under the Eighth Amendment to be free from cruel and unusual punishment.

Count IV of the Third Amended Complaint addresses the plaintiff's claims of supervisory liability against defendants Matheney,[1] Ballard, Rhodes, Dillon, and Rubenstein.  He claims that all of these individuals, except for defendant Dillon, were supervisors of the correctional officers involved in these uses of force.  [*Id.* at 16, ¶ 67].  He further asserts that these defendants have either used, or permitted other correctional officers to use, force against inmates, "not for the purpose of restraint or discipline, but for the malicious and sadistic purpose to punish."  [*Id.* ¶ 68].

The Third Amended Complaint further alleges that these defendants, as well as defendant Dillon, knew or should have known of the pervasive and widespread abuse of inmates at Mount Olive Correctional Complex ("MOCC") but, nevertheless, failed to properly investigate, train, supervise and discipline correctional officers in order to alleviate the known substantial risk of

---

[1] Defendant Matheney did not join in the instant Motion to Dismiss.  Rather, on October 23, 2014, he and defendants Fernandez and Hilewitz filed an Answer to the Third Amended Complaint [Docket 46].  Accordingly, I will not assess the sufficiency of the supervisory liability claim against defendant Matheney herein.

harm to inmates, which, the plaintiff claims, proximately caused the violation of his constitutional rights. [*Id.*, ¶¶ 69-73]. Thus, the plaintiff contends that these supervisory defendants were deliberately indifferent to his safety. [*Id.*, ¶ 74]. The plaintiff further alleges that such deliberate indifference is demonstrated by Warden Ballard's implementation of a policy known at the prison as "martial law," whereby Ballard has authorized the routine use of force against inmates in the segregation units at MOCC without regard to written WVDOC policies or constitutional standards regarding use of force. With the Third Amended Complaint, the plaintiff provides documentary evidence that acknowledges the use of "martial law." [Docket 35, Attach. 1 at 8].

The plaintiff further contends that defendant Rhodes, who is the Chief Correctional Officer (and sometimes serves as Acting Warden of Security), has specifically instructed correctional officers that they do not have to make "efforts to temper" the use of force to those locked in the segregation units, as evidenced in an email he sent to various correctional staff. [Docket 35 at 19-20, ¶¶ 86-90 and Attach. 1 at 9]. This same email states that the "habit of not using the chair in connection to uses of force is being practiced . . . but generally speaking the inmate will be restrained in the chair in conjunction with needed uses of force." [*Id.*] The plaintiff further contends that these directives from Ballard and Rhodes have resulted in a pattern and practice of the excessive use of force on the segregation units and the repeated violation of WVDOC policies pertaining to use of force and the restraint chair by correctional staff. [*Id.* at 21-28, ¶¶ 91-118].

## STANDARD OF REVIEW

In *Bell Atlantic Corp v. Twombly*, 550 U.S. 544, 570 (2007), the Supreme Court observed that a case should be dismissed for failure to state a claim upon which relief can be granted if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is

plausible on its face."  While the complaint need not assert "detailed factual allegations," it must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action."  *Id.* at 555.

The Supreme Court elaborated on its holding in *Twombly* in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a civil rights case.  The Court wrote:

> Two working principles underlie our decision in *Twombly*.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. [*Twombly*, 550 U.S.] at 555, 127 S. Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted). Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss.  *Id.*, at 556. * * *
>
> In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

*Iqbal*, 556 U.S. at 678-79.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct."  *Id.* at 678.  The defendants' Motion to Dismiss will be reviewed under Rule 12(b)(6) of the Federal Rules of Civil Procedure and the *Twombly/Iqbal* standard.

## ANALYSIS

On October 23, 2014, defendants Elliot, Ballard, Rubenstein, Dillon, and Rhodes, by counsel, filed a Motion to Dismiss [Docket 47] and a Memorandum of Law in support thereof [Docket 48].  These defendants assert that the plaintiff's Third Amended Complaint fails to sufficiently state a claim of supervisory liability against defendants Rubenstein, Ballard, Dillon

and Rhodes, and further fails to plead any constitutional wrongdoing by defendant Elliot. [Docket 48 at 5-9]. I will address the sufficiency of the Third Amended Complaint against defendant Elliot before turning to the supervisory liability claims.

### A.   The Third Amended Complaint fails to state a claim against Doug Elliot.

Concerning defendant Elliot, the defendants' Memorandum of Law asserts:

> Although Plaintiff has sued Doug Elliot, a correctional officer, it is unclear what the specific constitutional wrong that Defendant Elliot has engaged in since the complaint failed to identify the same. Also problematic is, at times, Plaintiff's failure to generally separate the constitutional wrongdoing relative to the particular Defendant that was engaged in such wrongdoing in his complaint. Throughout the complaint, reference is made to "defendants" collectively without separating the specific wrongdoing of the Defendants, individually. [*See, e.g.*, ¶¶ 33-39].

> * * *

> In this case, the only allegation pled in the Complaint involving Defendant Elliot is that at breakfast on October 1, 2012, at approximately 7:00 a.m. plaintiff gave his food tray to Officer Elliot at which time he told Elliot that he had been asking for mental health for months and he was done asking or talking about anything and he would not speak another word until mental health came down to speak to him. [Docket 35 at ¶ 27]. Clearly, this allegation, standing alone, is not sufficient to constitute a constitutional violation under the Eighth Amendment as articulated in *Farmer*. Plaintiff has failed to plead how reporting to Defendant Elliot about needing "mental health" satisfies the standard in determining whether there has been an Eighth Amendment violation as set forth in *Farmer*.[2]

[*Id.* at 3, 8-9].

On November 10, 2014, the plaintiff filed a Response in Opposition to the Motion to Dismiss [Docket 50].[3] The Response contends that inmates on his pod witnessed defendant Elliot enter the pod with the other defendants and that he "personally and directly took part in and applied the use of excessive force against the plaintiff." [*Id.* at 5]. The plaintiff's Response also asserts,

---

[2] In *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), the Supreme Court established that, in order for a prison official to be held liable under the Eighth Amendment, a plaintiff must demonstrate that the individual defendant exhibited deliberate indifference to a serious risk of harm to the plaintiff.

[3] The plaintiff's Response addresses a number of other issues, some of which are not even raised in the defendants' Motion to Dismiss and will not be addressed herein.

for the first time, that defendants Elliot, Matheney, Fernandez, and Hilewitz failed to intercede and protect him from a violation of his constitutional rights by the other officers.  [*Id.* at 6].  However, there are no such allegations in the very detailed Third Amended Complaint.  The court is meant to look at only the allegations in the complaint when reviewing a Motion to Dismiss.  *See, e.g.*, *Green v. JP Morgan Chase Bank, N.A.*, 562 Fed. App'x 238 (5th Cir. 2014) (noting district courts do not abuse their discretion when they disregard claims or theories of liability not present in the complaint); *Cutera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) ("A claim which is not raised in the complaint but rather is raised only in response to a motion for summary judgment is not properly before the court.");.

As noted in the defendants' Memorandum of Law, the only specific factual allegation in the Third Amended Complaint concerning Doug Elliot states as follows:

> At breakfast on October 1, 2012, at approximately 7:00 a.m. plaintiff gave his food tray to Officer [Elliot] at which time he told [Elliot] that he had been asking for mental health for months and he was done asking or talking about anything and he would not speak another word until mental health came down to speak to him.

[Docket 35 at 11, ¶ 27].  This allegation is insufficient to establish a basis for liability against defendant Elliot under the Eighth Amendment.  The only other references to defendant Elliot in the Third Amended Complaint may be construed as legal conclusions couched as factual allegations, which may be disregarded by the court under *Twombly* and *Iqbal*.  Therefore, I **FIND** that the allegations in the Third Amended Complaint fail to state a plausible claim against Officer Doug Elliot.

**B.    The sufficiency of the plaintiff's supervisory liability claims against defendants Ballard, Rhodes, Rubenstein and Dillon.**

In Count IV of his Third Amended Complaint, the plaintiff alleges that defendants Ballard, Rhodes, Rubenstein, and Dillon, acting in some capacity as supervisory officials, should be liable

6

to the plaintiff for the constitutional violations he alleges in Counts I through III.  In particular, the plaintiff alleges that defendants Ballard, Rhodes, and Rubenstein were supervisors of correctional officers at MOCC.  The plaintiff further asserts that these defendants, as well as defendant Dillon, were aware of the pervasive and widespread abuse of inmates at MOCC but, nevertheless, failed to properly investigate, train, supervise, and discipline correctional officers at MOCC whose conduct posed a substantial risk of harm to inmates like the plaintiff and, thus, proximately caused the plaintiff's alleged constitutional violations.

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit held that supervisors may be liable for the actions of their subordinates where the supervisor, *by his own conduct*, was deliberately indifferent to, or tacitly authorized or approved prior constitutional violations.  Such liability is not based on *respondeat superior*, but rather upon "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  13 F.3d at 798 (*quoting Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984)).  In *Shaw*, the Fourth Circuit discussed the following elements necessary to establish a supervisor's liability under 42 U.S.C. § 1983:

1) The supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff;

2) The supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and

3) There was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injuries suffered by the plaintiff.

13 F.3d at 799.  However, in *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court clarified that a prison official's "actual subjective awareness" of an excessive risk of harm or safety was

required to hold the official liable under the Eighth Amendment. Thus, a prison official cannot be held liable for the failure to alleviate a risk that he should have perceived, but did not in fact perceive. *Id.* at 838.

*The defendants' Memorandum of Law*

The defendants' Memorandum of Law in support of the Motion to Dismiss asserts that the plaintiff has pled only conclusory allegations that amount to no more than a threadbare recital of the legal elements of a supervisory liability claim. [Docket 48 at 6]. The Memorandum of Law states:

> In this case, Plaintiff failed to allege specific actions or conduct against the above referenced supervisory defendants other than threadbare recitals of the elements of a cause of action, followed by mere conclusory statements in violation of *Iqbal* and *Twombly*.

[*Id.*] Their Memorandum of Law further states:

> For example, in paragraph 68 of the Second [sic; Third] Amended Complaint, Plaintiff alleges in a legally conclusive manner that, prior to October 1, 2012, the above referenced supervisory Defendants several times used or permitted other correctional officers to use force against inmates, not for the purpose of restraint of discipline, but for the malicious and sadistic purpose to punish. However, Plaintiff has failed to point to those instances. In paragraph 69, Plaintiff claims that the conduct of . . . Ballard, Rhodes and Rubenstein, among other defendants was pervasive and constituted an unreasonable risk of constitutional injury to inmates like Plaintiff. Again, this allegation is a threadbare recital of the elements of a cause of action, supported by mere conclusory statements up to this point. Plaintiff has not factually demonstrated or factually pled the specific conduct that the subject Defendants were engaged in that constitutes deliberate indifference. The fact that these Defendants were in a supervisory position, without more, is insufficient. This is exactly what Plaintiff is attempting to achieve in the Complaint.

[*Id.* at 6-7]. The defendants repeat this argument with respect to the allegations in paragraphs 70 and 71 concerning these defendants' knowledge of the pervasive and widespread abuse of inmates at MOCC, and their failure to properly investigate, train, supervise and discipline correctional officers who engaged in such conduct, which the plaintiff claims amounts to deliberate

8

indifference to such conduct, or tacit authorization thereof.  [*Id.*]

> The supervisory defendants describe the plaintiff's claims against them as follows:
>
> Plaintiff claims that Defendants Ballard and Rhodes "are responsible for the day to day operations at MOCC and for the supervision of all staff and CO's under their control, responsible for all actions and conduct of said staff and CO's, and for the training in which they receive prior to working at MOCC. [Docket 35 at ¶ 14].  He alleged that Defendant Dillon is "responsible for receiving all inmate grievances and giving her recommendations to the warden.  Her job duties also include, but are not limited to, responding, addressing, investigating, denying and/or granting said inmate grievances."  He further alleges that Defendant Dillon is the "warden's assistant . . . ." [*Id.* ¶ 10].

[*Id.* at 2].  Their Memorandum of Law further asserts that "there is no evidence that Defendant Dillon was a supervisor.  Plaintiff referred to her as Defendant Ballard's assistant.  There is no evidence pled that indicates that she supervised any of the individual correctional officers that Plaintiff claims used excessive force upon him."  [*Id.* at 7].  The Memorandum of Law further asserts that the plaintiff's claims against these defendants, and defendant Rubenstein, fail as a matter of law. [*Id.* at 3, 5-8].

### *The plaintiff's Response*

The plaintiff's Response to the Motion to Dismiss asserts, *inter alia*, that defendants Dillon, Ballard, and Rubenstein have demonstrated deliberate indifference to the pattern and practice of using excessive force on the segregation units at MOCC because they routinely deny inmate grievances and appeals concerning such uses of force. [Docket 50 at 3-4, 12].  The plaintiff alleges that Dillon, the Warden's administrative services assistant, reviews all of the grievances and whatever recommendation she makes is "rubber stamped" by the Warden and the Commissioner. [*Id.*]  His Response further states:

> Defendant Dillon is liable under supervisory liability and [b]ystander liability.  She is the very one who answers all grievances regarding the use of force in Plaintiff's case and in hundreds of other inmates' grievances who have been assaulted by guards and had excessive [force] used against them and she repeatedly

> turns a blind [eye] to and covers up the brutality against inmates.  She is further well aware of the pattern and routine practice of the use of excessive force against Plaintiff and inmates.  *See* Exhibit D (inmate grievance).

[*Id.* at 12].  In the example grievance referenced by the plaintiff, which was filed by inmate Casey Rygh, he claims that defendant Dillon "clearly agreed with [] Matheney's notion that 'efforts to temper are not needed or required,' this documentation demonstrates that Defendant Dillon not only knew about the unconstitutional practice of not using efforts to temper, the pattern and routine practice of assaulting inmates she condones it and agrees with it."  [*Id.*]

In aid of his claims that the supervisory defendants were deliberately indifferent to a pattern and practice of widespread abuse of inmates at MOCC, the plaintiff's Response re-addresses evidence that was discussed in detail in his Third Amended Complaint, and supported by documents attached thereto.  While, generally, matters outside of the pleading may not be considered on a motion to dismiss, a court may consider the factual allegations in the complaint and any exhibits attached thereto that are authentic and integral to the complaint.  *See Blakenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006).

In particular, the plaintiff relies on a prior use of force against him in October 2009.  He also references an August 18, 2012 grievance filed by inmate Casey Rygh, who had both pepper spray and a stingball grenade deployed into his cell and was subsequently placed in a restraint chair for 8 hours after he would not return his food tray.  Captain Matheney responded to Rygh's grievance stating, *inter alia*, "being in a control unit, efforts to temper are not needed or required." [Docket 50, Ex. D].  The Warden upheld the denial of the grievance, finding that inmate Rygh "should have complied with the order to return [his] food tray.  The Captain was correct in his response."  [*Id.*]  The plaintiff also asserts that he was subjected to another instance of force in which an unidentified correctional officer sprayed "an entire 13 oz. canister of Phantom CS gas"

in his cell on or about September 1, 2012. [Docket 50 at 4].

The plaintiff also offers an August 26, 2013 inmate request form in which inmate Roger Smith inquired as follows: "I was told by an officer that Q2 unit of MOCC was under Martial Law. Is this true?" [Docket 50, Ex. E]. According to the document, on September 9, 2013, Lt. B. Penick responded stating, "Per Warden, Martial Law is a condition that MOCC utilizes." [*Id.*] The plaintiff also relies upon an email from defendant Robert Rhodes, the Chief Correctional Officer, to various corrections staff, including Brian R. Penick, dated September 9, 2013, in which Rhodes stated as follows:

> We do not have to give efforts to temper to those locked up in our Seg units – we do not move officers from their assigned post to create a vacancy and then fill that vacancy with someone working overtime. **NEW** is inmates removed from the restraint chair are immediately placed on BMP – AND once again the habit of not using the chair in connection with uses of force is being practiced – If you have questions as to whether the inmate should be placed into the chair call the ADO and then document the decision – but generally speaking the inmate will be restrained in the chair in conjunction with needed uses of force – rr

[Docket 50, Ex. F]. The plaintiff also attached his own Affidavit/Declaration to the Third Amended Complaint and his Response to the Motion to Dismiss, which states in pertinent part:

> Somewhere around August 1, 2012, I was told by several Correctional Officers that they did not have to use efforts to temper and that Quilliams-2 (Q2) was under "martial law."

[Docket 35, Attach. 1 at 1; Docket 50, Ex. B].[4] The plaintiff asserts that "it is abundantly clear by supporting exhibits that a widespread customary practice of using excessive force and inmates being routinely assaulted [sic; exists?] at MOCC." [Docket 50 at 13].

*The defendants' Reply*

---

[4] Although the Smith inmate request and the Rhodes email are dated after the subject incident in the plaintiff's Third Amended Complaint, those allegations and evidence in combination with the plaintiff's other allegations and evidence concerning conduct that occurred prior to the plaintiff's incident, are sufficient to allow the court to draw a reasonable inference that there is a pattern and practice of the use of excessive force by subordinate correctional officers for which defendants Ballard and Rhodes may be liable.

On November 14, 2014, the defendants filed a Reply [Docket 52], which reiterates their argument that the plaintiff has not alleged or presented any evidence to support a finding that defendant Dillon actually supervised any of the individual defendants involved in the use of force against the plaintiff.  The Reply further states:

> Under Plaintiff's framework, any employee or individual who is involved in the review of inmate grievances may be held constitutional liable as a supervisor for unconstitutional torts of correctional officers.  Plaintiff has not provided any legal support for this position that liability may be extended to a non-supervisor of a correctional officer under a supervisory liability framework.  Accordingly, there is no supervisory liability violation under the requirements articulated by the United States Court of Appeals in *Shaw v. Stroud*, 13 F.3d 781, 799 (4th Cir. 1994).  All of the *Shaw* requirements presume that official is a supervisor.

[Docket 52 at 3].  The defendants further assert that, even if Dillon is found to be a supervisor, the plaintiff's claim against her fails under the analysis set forth in *Iqbal*, in which the Supreme Court held that knowledge and acquiescence in a subordinate's wrongful conduct, without more, is insufficient to establish a constitutional violation on the part of the supervisor.  [*Id.* at 3-4].  The Reply further states:

> Not only is Defendant Dillon not a supervisor, her involvement in this matter (as alleged by Plaintiff) is limited to the review and adjudication of inmate grievances.  As to the latter, Defendant Dillon argues that assuming all of Plaintiff's allegations are true regarding her role in the inmate grievance review process, her level of involvement will be limited to having mere knowledge of the alleged violations of excessive force, the same conduct which the Supreme Court in *Iqbal* refused to find a supervisor liable for the acts of insubordinates [sic; subordinates].

[Docket 52 at 4].

The defendants' Reply further asserts that the plaintiff has also failed to advance any plausible allegations or evidence to support his supervisory liability claims against defendants Ballard, Rubenstein and Rhodes.  Their Reply states:

> His claimed basis for supervisory liability claims against these defendants is their failure to properly supervise, investigate, and discipline their employees and/or exercise control over them.  He also alleges negligence in their supervisory duties,

12

resulting in, and proximately causing, the incident that led to the filing of the instant action. (Response Brief at 11). He further alleges that these Defendants failed to enforce rules, post orders, and policies requiring efforts to temper before using force on inmates who are securely locked in their cells. *Id.* As previously argued in these Defendants' initial motion to dismiss, Plaintiff's allegations amount to threadbare recitals of the elements of a cause of action, followed by mere conclusory statements in violation of *Iqbal* and *Twombly*. Plaintiff has failed to point to any plausible evidence regarding how the supervisory defendants failed to discipline, train, or supervise the correctional officer Defendants who Plaintiff claimed used excessive force on him. Importantly, Plaintiff has failed to plead facts that demonstrate deliberate indifference on the part of the supervisory Defendants.

[*Id.* at 5-6].

In *Shaw*, the Fourth Circuit held that "liability is ultimately determined by pinpointing the person/persons in the decision making chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." 13 F.3d at 799. The decision in *Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010), is also instructive on supervisory liability in the wake of *Iqbal*. In *Dodds*, the court found that

§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected," that plaintiff "to the deprivation of any rights . . . secured by the Constitution . . ." [citation omitted]; *see also Davis v. City of Aurora*, 705 F.Supp.2d 1243, 1263–64 (D. Colo. 2010) ("The exercise of control which may create the "affirmative link" does not need to be the sort of on-the-ground, moment-to-moment control that defendants appear to suggest. Rather, the establishment or utilization of an unconstitutional policy or custom can serve as the supervisor's "affirmative link" to the constitutional violation.... [W]here an official with policymaking authority creates, actively endorses, or implements a policy which is constitutionally infirm, that official may face personal liability for the violations which result from the policy's application."). A plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. [Footnote omitted]. *See Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002) ("Under 42 U.S.C. § 1983, Summum must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a person (4) who acted under color of any

statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia." (internal quotations and citations omitted)). Denying qualified immunity on the basis of such a showing complies with *Iqbal*'s requirement that § 1983 liability only be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs prove each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation.

*Id.* at 1199-1200.

Taking the plaintiff's allegations as true, the plaintiff's very detailed Third Amended Complaint, and the integrated documents attached thereto, contain specific factual allegations and evidence which could permit a jury to find that defendants Ballard and Rhodes (1) promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.  Thus, I **FIND** that the plaintiff has alleged specific facts that would allow the court to draw a reasonable inference that the conduct of defendants Ballard and Rhodes violated the plaintiff's Eighth Amendment rights.

However, I further **FIND** that the threadbare and conclusory allegations in the Third Amended Complaint against defendants Dillon and Rubenstein, alleging little more than their role in the denial of grievances, are insufficient to state any plausible claims against them.  *See, e.g.*, *Larson v. Meek*, 240 Fed. App'x 777, 780 (10th Cir 2007) (inadequacy of allegations involving supervisory liability based on denial of grievances); *Ferris v. Jones*, No. 4:14-cv-454, 2015 WL 4668297, at *9 (N.D. Fla. Aug. 5, 2015) (granting a motion to dismiss for failure to state a claim of supervisory liability claims predicated on the denial of grievances).  Therefore, based upon the principles of *Twombly* and *Iqbal*, I **FIND** that the plaintiff's Third Amended Complaint fails to state a claim against defendants Dillon and Rubenstein.

14

## CONCLUSION

For the reasons stated herein, the defendants' Motion to Dismiss [Docket 47] is **GRANTED** with respect to defendants Rubenstein, Dillon and Elliot, and **DENIED** with respect to defendants Ballard and Rhodes.

The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

ENTER:        September 30, 2015

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE